**STATE of Missouri, Respondent,**

v.

**James CROW et al., Appellants.**

**No. 57283.**

Supreme Court of Missouri,
Division No. 1.

Nov. 13, 1972.

Motion for Rehearing or to Transfer to Court En Banc Denied Dec. 11, 1972.

**462**

John C. Danforth, Atty. Gen., Richard S. Paden, Asst. Atty. Gen., Jefferson City, for respondent.

C. Myrl McGlothlin, Nevada, Mo., for appellants.

HIGGINS, Commissioner.

James Crow, William E. Jordan, and Merle V. Steele, jointly charged, were convicted by a jury of obtaining money from Maude Williams with intent to cheat and defraud by means of trick, deception, and false and fraudulent representation, statement or pretense, commonly called "the confidence game." The jury was unable to agree on defendants' punishment; the court fixed their punishment at two years' imprisonment and rendered sentence and judgment accordingly. § 561.450, V.A.M. S.; Rule 27.03, V.A.M.R. (Appeal taken prior to January 1, 1972.)

By Points 1, 2, 5, and 6, appellants assert insufficiency of evidence to sustain their convictions on grounds: the verdict is against the law and the evidence; error in refusal of motion for acquittal at close of State's case; defendants never identified except "by pointing to defendants" as to "who performed work," "who promised work," and that "Maude Williams ever did business with these defendants, and if so, she was defrauded thereby"; and failure to show Maude Williams relied upon false representations and was deceived thereby as charged in the amended information.

David Swearingen, assistant cashier, First National Bank, Nevada, Missouri, identified Exhibits 1 through 32 as checks drawn by Maude Williams, totaling $2,423, on her account in his bank. Exhibits 1 through 17 were checks totaling $1,255 with divers dates from October 4, 1970, to November 23, 1970, payable to William E. Jordan and endorsed by Jordan. Exhibits 1 through 5 and 7 were unmarked as to their purpose; otherwise, Exhibits 6 through 17 were variously marked for "spraying shrubbery," "repair all three houses," "spraying two houses and labor," "bracing and labor," "foundation repairs, three houses," "painting house, 252 North Elm," "painting house, 204 North Elm," "bracing three houses and guttering," "replace guttering, three houses," "treating three houses, shed and roofing," "painting screen windows, 252 North Elm."

Exhibits 18 through 30 were checks totaling $1,023 with divers dates from October 8, 1970, to October 29, 1970, payable to Merle Steele and endorsed by Steele. Exhibits 18, 19, and 23 were unmarked as to purpose; otherwise Exhibits 20 through 30 were variously marked for "labor," "bracing house," "spraying home," "foundation and repair," "painting three houses," "sealing foundation," "painting garage," "killing mice and rats," "insulating three houses and labor," "Nevada Pest and Termite."

Exhibits 31 and 32 were checks totaling $145, dated November 12 and 16, 1970,

payable to James Crow, endorsed by Crow, for "foundation three houses, repair," and "guttering, foundation repair, three houses."

Maude Williams kept a fairly large checking account, writing twelve to fifteen checks per month on the average. During October and November, 1970, the foregoing were in addition to her average number of checks per month. The bank became disturbed and checked with Ingles Ferry who helped Maude Williams with her account. Miss Williams was in her "70's or 80's," competent, and one who acted of her own mind.

J. W. Pursley, Sheriff of Vernon County, interviewed defendants while in jail:

"Mr. Jordan told me, speaking of the work, I asked him which houses of Mrs. Williams he had worked on and he informed me that he didn't work on any of the houses; that he and Steele were collectors; that they done the collecting and somebody else done the work. I asked him who done the work. He said one that had done some work for them was Jerry Simmons. We were unsuccessful in locating a Jerry Simmons who he said had left Vernon County the day before. * * * I asked him about spraying and doing carpenter work and so forth and he said they treated a house at 220 North Elm for all kinds of bugs in October of '70, I think. I think it was Jerry Simmons who done the work and I think I charged her $120.00 for it. I asked him if she had a receipt for all of her checks that she had paid for and the work done and he said: 'No, we don't give receipts.' * * * The last time I believe was work done before Simmons left he supposedly collected $20.00 in cash and a $25.00 check and that was the last time he had seen him. * * * Jordan said: 'On all of the jobs that we have done, Simmons gets 50%, I get 25% and Steele gets 25% of all jobs.' That seemed to be standard procedure. Later on down he said: 'They exterminated a house but I don't know what they got out of it. I didn't collect for it but I got my 25% for my share, I

would guess about $80.00 is what they charged.' 'She, Maude Williams, always writes a check when I tell her what she owes me.' * * * Mr. Steele's statement was pretty much the same as Jordan's. He worked with him a lot. I think he was the person who had a City permit, Pest and Termite Control, No. 8687, issued by the City of Nevada. * * * Again Jerry Simmons was involved on work that was done. He said: 'I and William Jordan sprayed three houses for termites at a cost of—I don't know, I just don't remember how much the price was that she paid, about two months ago. She paid Jordan, I think, I am not for sure; October 4th she paid us $72.00. I don't remember how much she paid, it must be in another book.' * * * 'She has give about three checks to me in the last month or so, I think, one for $50.00, one for $60.00 and one for about $50.00 and I give 50% of that to Simmons and 25% to Jordan. We got paid for painting, I don't know for what houses, it seems to me like 925 North Colorado. Jordan has paid me about $300.00 for my part of the work done on Mrs. Williams' houses since we have worked for her.'

" 'I went by today'—this is Steele talking —'I went by today to get my book I left on South Pine, I had done some work with Jack Seitz, he collected and then paid me and later on he said Mrs. Williams paid him $120.00 yesterday, November 24th or 25th for work done, I don't know what it was, Simmons supposedly done it and left.'

"I talked to James Crow. He had worked with Jordan and Steele. He says: 'Steele, Rocky and I have done some spraying for Maude Williams about a month ago. I think she paid me $84.00 for the work, that is on the house where she lives. We three sprayed the second house north of Mrs. Williams. We used Merle Steele's rig. She paid me $75.00 for the job, I think. Me and Rocky Jordan went back and tried to brace the floor up a little bit in the house where she lives. I think

that check was made to Jordan for $75.00. That is all the work I have done for Maude Williams.' That was about the usual run of the conversation with Mr. Steele and Mr. Crow. That they at times did operate their equipment, but Mr. Jordan said he didn't operate equipment, he was a collector, but he never did know the work was done on anything. He just said he was notified to go collect and he would go and tell her how much she owed. * * * She would write the check for whatever he told her to.

"Rocky Jordan. * * * Well he said he never did see the work but he said the word got back one time to see her about work on a roof on a garage, that they had roofed her garage and to go by and collect for it, and he went by and collected for it and that was the time Simmons supposedly collected for it and left town. At that time I think he told me that she didn't pay him because she had already paid Simmons. * * * They had sprayed three houses and on other occasions had sprayed different houses or spray painted them. * * * William Jordan * * * didn't say too much about the work. He was the collector, he didn't work. * * * He said he and Steele were collectors—Rocky said that. * * * I asked him how he determined the amount due if he didn't know the amount of work that was done and he said: 'They usually tell me what they done and I've been in the business long enough to know what the charge would be.' * * * They claimed they worked on a foundation at one house and they claimed to of worked on bracing up the porches on the house she lives in and that they sprayed three houses and the shrubbery around them. In fact, one house I think they claimed they sprayed the shrubbery three times in a month. * * * One house I think they mentioned they had painted, spray painted a house. * * * She paid all three of them money. I think in all three cases they admitted giving one of the others part of it. * * * Rocky stated they don't give receipts or don't give statements. 'We never give her a state-

ment for our work or a receipt for her check.' "

Glenn Barker, a tree trimmer and exterminator in Nevada since 1941, stated it would take no longer than two hours to spray Miss Williams's three houses for termites and the charge would run about $150. The charge for spraying all her shrubbery and trees would run about $15 or $20.

Clifford Porter, a carpenter in Nevada since 1935, had worked for Miss Williams for five or six years preceding these events. He inspected her three houses prior to trial and noted there was no new roof on the garage, no apparent work on her house, no painting, no new guttering or bracing of the foundation. He could see no repair work, no major carpentry work, and no recent work. He stated $2,000 worth of carpentry would be apparent and obvious carpentry work. He could see no place where that amount of money was represented by work on Miss Williams's properties.

Ingles Ferry was a nephew of Miss Williams's sister. His attention was called to Miss Williams's bank account and he determined that her funds were being depleted by checks for various things such as termite treatment, repairs, maintenance, and painting. He visited Miss Williams's properties and could find no evidence of any such work. Miss Williams was not incompetent but was not as strong mentally as she had been twenty years prior to these events. She was not called as a witness because Mr. Ferry did not think it would do her any good mentally.

Defendants did not adduce any evidence. Their theory was, and is, that they entered into contracts with Miss Williams to do termite and carpenter work; that payment was made by checks, in full, for services rendered; that Miss Williams was a strong-willed person; that she was not defrauded; that she inspected all work and, upon her approval, gave the checks in question.

■ With respect to the sufficiency of the State's case, a jury reasonably could find that Miss Williams was deceived by defendants in that she paid defendants more than $2300 on their representations that she owed them such sums for work performed on her properties; that such work was neither necessary nor was it performed; and that there was no contract between the parties as asserted by appellants. See, e. g., State v. Fields, Mo., 366 S.W.2d 462; State v. Smith, Mo., 324 S. W.2d 702.

■ The absence of testimony from Miss Williams is not fatal as a failure to show reliance upon a false or deceitful representation or device of defendants, State v. Wilson, 223 Mo. 156, 122 N.W. 701, because a jury could reasonably infer from the payments made by Miss Williams that she parted with her property in reliance upon their representation, and that they were false and deceitful because the work so represented was neither necessary nor performed.

■ The asserted failure of identification is refuted by the record which shows that Sheriff Pursley identified defendants in the courtroom as the men he interrogated and from whom he secured the quoted admissions with respect to their dealings with Miss Williams. And, in these circumstances, it was unnecessary to show who performed or promised to perform certain work because the admissions recited by the sheriff show the defendants to have acted in concert.

Appellants' citation, State v. Cunningham, Mo., 380 S.W.2d 401, is without value because in this case the information alleged, and the proof showed, that the victim relied upon defendants' false representation in paying her money to them.

Similarly, appellants' assertion that the verdict is improperly based upon conclusion and opinion is refuted by the record which shows the presence of both direct and circumstantial evidence, and opinions, all of which were properly admitted. State v. Fields, supra.

■ By Point 4 appellants assert that Sheriff Pursley volunteered a statement which constituted reversible error. The alleged statement came upon defendants' cross-examination of the sheriff. No objection was made, nor was any motion directed toward striking it or to declaration of a mistrial. Accordingly, no such ground of error was preserved. State v. Ingram, Mo., 286 S.W.2d 733.

■ By Point 3, appellants assert they were restricted in their voir dire examination of the jury. The transcript does not contain the voir dire examination and it shows that both sides conducted such examination. Accordingly, there is no demonstration of record upon which to review such asserted error.

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.