154 N.J. Super. 386 (1977)
381 A.2d 704
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSEPH BORATTO AND MARTIN SILVERMAN, DEFENDANTS-APPELLANTS.
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSEPH BORATTO AND MARTIN SILVERMAN, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 20, 1977.
Decided November 30, 1977.
*391 Before Judges MATTHEWS, CRANE and ANTELL.
Mr. Richard Newman argued the cause for appellant Joseph Boratto (Messrs. Isles, Newman and Weissbard, attorneys; Mr. Richard Newman and Mr. Gerard McDonnell on the brief).
Mr. Jack L. Cohen argued the cause for appellant Martin Silverman (Messrs. Greenberg and Margolis, attorneys; Mr. Jack L. Cohen and Mr. Stephen N. Dratch on the brief).
Mr. Albert G. Fredericks, Deputy Attorney General and Mr. Phillip B. Whitcomb, Deputy Attorney General, argued the cause for respondent (Mr. William F. Hyland, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by ANTELL, J.A.D.
These are unconsolidated appeals from judgments of conviction following a trial by jury. Defendants were tried together under the same indictment, and the appeals involve many common questions. Therefore they have been jointly considered and both will be decided in this opinion.
Defendants are attorneys who practice together as partners. They were convicted under a multiple-count indictment charging Boratto in the first count with the crime of uttering a document falsely purporting to be the last will and testament of Michael G. DePhillips, N.J.S.A. 2A:109-1(b), and in the second count with obtaining money by false pretenses from the estate of Michael G. DePhillips, N.J.S.A. 2A:111-1. The second count rests upon the representation that the will referred to in the first count was genuine. Silverman was charged in the third count with perjury, N.J.S.A. 2A:131-1, in that he falsely swore before a special deputy surrogate that he witnessed decedent execute his will, and in the fourth count with obtaining money by false pretenses from decedent's estate by falsely pretending that the will was genuine, N.J.S.A. 2A:111-1.
*392 The theory of the prosecution was that Boratto and Silverman filed for probate with the Bergen County Surrogate on January 9, 1973 a will dated October 8, 1972 which Silverman, a subscribing witness, swore was signed in his presence by DePhillips. DePhillips had died December 10, 1972 and the will named Boratto, decedent's nephew and for some years his attorney, as executor.
Following the issuance of letters testamentary Boratto appointed himself attorney to the estate. The monies which the indictment charges the two defendants received by false pretenses were more than $50,000 in attorneys' fees and fiduciary commissions received between May 1973 and March 1975.
The investigation culminating in the indictment was prompted by Carmine Deer, who was married to decedent's sister and who expected his wife and daughter to be provided for by decedent. He first examined the will in February or March 1973 and was disappointed that the entire estate was left to decedent's widow.
Deer visited the office of the Bergen County Prosecutor in early November 1973, and the prosecutor forwarded to the New Jersey State Police for examination and report a copy of the signature appearing on the questioned will together with specimens of the decedent's authentic signature. On January 25, 1974 the State Police handwriting examiner reported that the specimens studied indicated that the questioned signature was genuine. The prosecutor called for further examinations on February 5, 1974 and April 18, 1975 and supplied additional specimens of decedent's verified signature. The examiner's opinion remained unchanged. However, in response to the prosecutor's fourth request on May 20, 1975 he replied that the questioned signature was a forgery. By then he had received approximately 235 specimens of decedent's verified writing.
Boratto testified before the Bergen County grand jury on August 12, 1975 and defendants were indicted August 19, 1975. To prove the charges at trial the State introduced two *393 expert opinions identifying the signature on the will as a forgery, Deer's testimony describing his conversations and relationship with decedent, Boratto's grand jury testimony, and evidence that the backer on the will was delivered to defendants after October 8, 1972, the will's purported date of execution. Prolonged testimony was also heard that the fees and commissions taken by defendants were greater than should reasonably have been allowed for services ordinarily required to administer such an estate.
Defendants did not testify; they relied on the opinion evidence of two handwriting experts and testimony from decedent's sister, brother and widow, who knew decedent's handwriting well, to the effect that the signature was genuine. They also introduced opinion testimony that the fees and commissions received for the particular services rendered this estate were within reason.
On this appeal defendants seek reversal of their convictions based on numerous claims of error in the proceedings below. We deal first with their complaint that the Deer testimony should not have been received. This witness testified about his long and warm association with decedent, the "loving relationship" between his children and the decedent and his disappointment in learning that neither his wife, who was decedent's twin sister, nor his children had been remembered in the will. He explained his original suspicions about the will (which were highly conjectural) and what he did to ascertain which courses of action were open to him. In the course thereof he recounted opinions which he expressed at different times that the signature was forged.[1]
Deer's testimony was prejudicial hearsay and should not have been allowed. The rationale by which the jury was allowed to weigh this testimony was the "state of mind" exception, *394 Evid. R. 63(12), and was based on the supposition that a purported will which overlooked Deer's family was inferably forged. The premise of this logic is that decedent said something in these conversations which was inconsistent with the provisions of the will. But Deer's testimony nowhere even suggests that he and decedent ever even mentioned the latter's will or the disposition of his estate. All that appears is that Deer, apprehensive about a history of early cardiac failures in his own family, confided his anxiety about this to decedent. The only assurance given by the decedent was that if Deer should die he would look after his wife and children.
The most recent of these talks occurred about three months before the date of the will's execution. Nothing was said about decedent's testamentary plans. Thus, decedent's state of mind, so far as it was revealed by the conversations was neither "in issue" nor "relevant to prove or explain acts or conduct of the declarant" under Evid. R. 63(12)(a). Nor do the conversations meet these qualifications to the extent that they serve to explain Deer's early suspicions. Those reasons had no bearing on any of the issues in the case.
Defendants complain that the trial judge failed to instruct the jury on "reliance" as an element of the crime of obtaining money by false pretense. Reliance is an essential element of this offense and their contention is sound. State v. Butler, 27 N.J. 560, 595 (1958); State v. Lemken, 136 N.J. Super. 310, 318 (App. Div. 1974), aff'd 68 N.J. 348 (1975); State v. Zwillman, 112 N.J. Super. 6, 12 (App. Div. 1970), certif. den. 57 N.J. 603 (1971). The only allusions to the false pretense counts in the charge are the following:
Now, if you find that the Will was forged and both had knowledge of it, you find the defendants guilty of the first count as to Mr. Boratto and the third court as to Mr. Silverman, there was an intent to defraud, an intent to mislead in both cases, then you have in fact found as to the second and fourth courts that they obtained money by virtue of a false pretense, and you need not even go further, if in fact you find that they obtained money which, of course, is the next question, you have to find that money was obtained.

* * * * * * * *
*395 Now, obtaining money under false pretenses. False pretenses requires that there's a misrepresentation. Well, you could understand the misrepresentation flowing from the uttering a Will that's misrepresented to be the signature of the decedent, and the misrepresentation by Silverman, if you find these beyond a reasonable doubt, flowing from the fact that he saw De Phillips sign the document in his presence and that he wasn't De Phillips.
All right, let's talk a little bit more about obtaining money under false pretenses. You haven't heard much testimony as has been alluded to the defendant Silverman about him. Now you have to determine, and again it all flows from the fact of whether the will was false or not, when fees  and that's another reason why you have to talk about fees  were put into the account, you have to determine if Mr. Silverman knew that. Because normally a partner in a law firm or in any business, if one partner is out somewhere else and he's earning a fee or earning some money and he comes in with the checks, he puts it in the account and his partner doesn't know what that's all about, he can't be charged with knowledge of taking money unless he was a party to the thing. So ordinarily a partner is not charged criminally with the acts of a co-partner merely by reason of the partnership relation, there must be knowledge and show that he benefited in that.
Defendants maintain also that the record is barren of evidence that monies were paid in reliance by the estate upon any false pretense they made to the estate. This point too has merit. The fees and commissions were paid for services rendered and not in reliance upon a misrepresentation. The alleged false representation which lies at the heart of the prosecution, i.e., that the will was genuine, was made to the surrogate. No monies were paid to or received by either of the defendants in reliance upon that representation. What was obtained on the strength of that representation were the letters testamentary the surrogate issued to Boratto. Unquestionably this was a benefit which could have been alleged as the subject matter of the indictment, but the State chose not to follow that course.
Moreover, the conceptual basis of the State's argument that the estate was acting in reliance upon the defendant's false pretense that the will was genuine does not withstand analysis. The management of the estate rested entirely with Boratto and he alone was responsible for paying the obligations *396 of the estate. In re Sapery, 28 N.J. 599, 609 (1959). Obviously, an "estate," consisting only of the assets and liabilities of decedent, being neither a natural or an artificial person, 33 C.J.S., Executors and Administrators, § 3e; Behnke v. Geib, 169 F. Supp. 647, 650 (Md. D.C. 1959); Tanner v. Best's Estate, 40 Cal. App.2d 442, 104 P.2d 1084, 1086 (D. Ct. App. 1940), is competent to achieve a condition of the mind such as "reliance" only through its fiduciary representative. Since Boratto occupied that position he could not have acted in innocent reliance upon a misrepresentation which he had himself knowingly made.
We do not agree that a different conclusion is called for by State v. Zwillman, 112 N.J. Super. 6 (App. Div. 1970), certif. den. 57 N.J. 603 (1971). There the defendant, an attorney, acted in complicity with a claims adjuster to process fraudulent accident claims through an insurance company. The court rejected defendant's argument that the employee's knowing participation in the scheme nullified any claim of reliance by the company. It held that both participants could be criminally answerable as principals since the company had relied on the false pretenses for which they were jointly responsible. But the victim therein was a large business corporation, and the question of its reliance was not controlled simply by whether that employee knew of the fraud. The company functioned through administrative and clerical procedures which were designed to pay claims in reliance on the very representations there made, not only by defendant that the accidents happened, but also by the employee that he had conducted bona fide investigations and was satisfied that the claims had merit. Thus, on the rule that aiders and abettors are punishable as principals, N.J.S.A. 2A:85-14, defendant there could validly be found answerable for the misrepresentations made by the unfaithful employee to his employer. See State v. Lemken, 136 N.J. Super. 310, 318 (App. Div. 1974), aff'd 68 N.J. 348 (1975). But the internal mechanisms by which the corporate mind arrives at a state of reliance are absent from a decedent's estate which, as we have *397 said, separated from its fiduciary representative, amounts to nothing more than decedent's assets and liabilities and lacks the legal status, the lines of authority and the administrative apparatus of a corporation.
The issue was not specifically raised on the appeal, but we advert to what we regard as defects in both counts of the indictment charging the defendants with obtaining money by false pretense. The second count, charging Boratto, reads as follows:
AND the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that JOSEPH G. BORATTO on or about, during and between May, 1973 and March, 1975, in the jurisdiction set forth in the First Count herein, intending to cheat and defraud the ESTATE OF MICHAEL G. DE PHILLIPS, did then and there unlawfully, knowingly and designedly falsely represent that he was executor of the estate of the deceased MICHAEL G. DE PHILLIPS, whereas in truth and in fact MICHAEL G. DE PHILLIPS had never executed the will appointing JOSEPH G. BORATTO as executor of his estate, and the ESTATE OF MICHAEL G. DE PHILLIPS being deceived thereby was defrauded of divers sums of money directly obtained by JOSEPH G. BORATTO, and the said JOSEPH G. BORATTO did furthermore falsely represent and pretend to DOROTHY HIGBIE Special Deputy County Surrogate, on or about the date set out in the First Count, that the Will that the said JOSEPH G. BORATTO uttered for probate was the true will of MICHAEL G. DE PHILLIPS; whereas in truth and in fact MICHAEL G. DE PHILLIPS had never signed the said document and as a direct result of all of the aforementioned false representations, the defendant JOSEPH G. BORATTO received fees in excess of $50,000., contrary to the provisions of N.J.S. 2A:111-1, and against the peace of this State, the government and dignity of the same.
Nowhere is it said to whom the representation was made "that he was executor of the estate of the deceased Michael G. DePhillips." Furthermore, and making full allowance for the words "unlawfully, knowingly and designedly falsely represent" as a summary imputation of intent and knowledge, nowhere is it alleged that anyone relied upon the representation in the belief that it was true. This is also the fact as to the representation allegedly made to Higbie that the will *398 "uttered for probate was the true will of Michael G. DePhillips". All that appears is that the estate was "defrauded of divers sums of money directly obtained by Joseph G. Boratto" and that "as a direct result of all of the aforementioned false representations" defendant received fees in excess of $50,000. Such a pleading does not conform with the mandate of State v. Lamoreaux, 29 N.J. Super. 204, 207 (App. Div.), aff'd 16 N.J. 167 (1954), that "in false pretense cases the indictment must state the facts of the crime with as much certainty as the nature of the case will reasonably admit." Nowhere does it describe the mechanics of the fraud between making the representation to an unspecified party and obtaining the money.
The fourth count, charging Silverman, recites:
AND the Grand Jurors aforesaid, upon their oaths aforesaid, do further PRESENT that MARTIN SILVERMAN on or about, during and between May, 1973, and March, 1975, and in the jurisdiction set forth in the First Count herein, intending to cheat and defraud the ESTATE OF MICHAEL G. DE PHILLIPS, did then and there unlawfully, knowingly and designedly receive fees in excess of $50,000. as a result of the false representations that he made to DOROTHY HIGBIE, Special Deputy Surrogate of the Surrogate's Court of Bergen County, to wit: that he the said MARTIN SILVERMAN had witnessed MICHAEL G. DE PHILLIPS sign his "Last Will and Testament" and that JOSEPH G. BORATTO was the other subscribing witness, and that JOSEPH G. BORATTO was present with MARTIN SILVERMAN when MICHAEL G. DE PHILLIPS had signed his "last Will and Testament"; when in truth and in fact MICHAEL G. DE PHILLIPS never signed the aforementioned Will and Testament offered for probate, and MARTIN SILVERMAN did receive the aforementioned legal fees as a direct result of these false representations, contrary to the provisions of N.J.S. 2A:111-1, and against the peace of this State, the government and dignity of the same.
This count also fails to allege reliance. The recitation that monies were received "as a result of the false representations that he made to Dorothy Higbie" and that he received the fees "as a direct result of these false representations" does not suffice as a statement of this essential element of the offense. If the prosecutor has formulated a valid theory *399 of the crime which takes all its legal requirements into account it should be fully articulated. See, for example, the explicit pleading considered in State v. John P. Callaghan Co., 70 N.J. Super. 585, 589 (Law Div. 1961). Surely the State knows who relied on the false representation, and all that proper pleading requires is that this be recited with specificity in the indictment. If the case has not been sufficiently analyzed in terms of its legal components, the benefits of requiring that this be done are obvious.
Evidence was received that the affairs of the estate were being mismanaged by Boratto and that his fees and commissions were unreasonably large. The testimony encompassed highly technical data which were irrelevant to the crimes charged. The issue was the subject of far-ranging expert testimony on both sides of the case and involved numerous transactions involving thousands of dollars and practices on Boratto's part which might have suggested to the jury the flavor of rampant criminality in respects other than those for which he was on trial. It was clearly prejudicial. This is particularly so as to Silverman who was never shown to have played any part in managing or representing the estate. The justification offered for this evidence was that it proved "motive." Our careful study of the transcript, however, satisfies us that the subject was dwelt on to such a degree and in such detail that whatever legitimate purpose might have been advanced by its introduction was substantially outweighed by its prejudicial impact. Evid. R. 4. Notwithstanding that decedent's widow, who was the sole beneficiary of the estate, expressed her satisfaction with Boratto's services and the reasonableness of his charges, the jury might still have sensed that the payments were the results of overreaching.
If it was the State's purpose to show that defendants were motivated to commit the crimes by the prospect of commissions and fees it would have been enough merely to demonstrate that these substantial payments were actually made.
*400 We consider now the use made against Silverman of Boratto's grand jury testimony. It was received over objection and Silverman argues that this was error. The inculpatory references were: (1) Silverman was a law partner of Boratto; (2) Silverman shared profits and losses in the firm, including fees received from the DePhillips' estate; (3) Silverman's signature appeared as a subscribing witness on the will; (4) Silverman accompanied Boratto to the surrogate's office and executed the affidavit which formed the basis of the perjury count; (5) Silverman's signature appeared on the will as a subscribing witness.
Receipt of this evidence constituted prejudicial error as to Silverman. Without it the gravest doubt exists as to whether the counts against him could properly have been submitted for jury deliberation. The trial judge expressly stated that he relied upon the Boratto grand jury testimony in denying Silverman's motion for judgment of acquittal. The violation of the hearsay rule and Silverman's right to confront witnesses against him are too clear to require discussion. Bruton v. United States, 391 U.S. 123, 127, 136, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); State v. Young, 46 N.J. 152, 156 (1965). Though it would not have corrected the error committed, the trial judge failed even to give the jury any guidance as to the role of this evidence in the case against Silverman, and we note that the jury interrupted its deliberations to request that it be reread.
The importance of Boratto's grand jury testimony achieves significant proportions when it is realized that there is no other evidence in the record establishing that the party who executed the affidavit before the deputy surrogate was actually Silverman and not someone else using his name. The deputy surrogate testified only that Martin Silverman executed the affidavit without saying who Martin Silverman was or identifying him in court. She made no pretrial identification of this defendant, as in State v. Draughn, 121 N.J. Super. 64 (App. Div.), aff'd o.b. 61 N.J. 515 (1972); did not testify to any identification procedure which she followed *401 in taking the oath, and no handwriting expert testified that the signature on the affidavit was that of defendant.
We observe that this issue would not have arisen had the prosecutor made application, as he was required to do by R. 3:15-2(a), for relief from prejudicial joinder where he intends to utilize a statement given by one of several codefendants.
It is correctly stated by Silverman that the record is deficient in proof of knowledge on his part that it was not DePhillips who executed the will, and argues that this is a fatal omission in the State's proofs.
It is settled that in prosecutions for perjury and false pretenses it must be shown defendant knew the representation or testimony was false. Failure of proof in this respect compels an acquittal even where the representation was factually untrue. State v. Greco, 29 N.J. 94, 103 (1959); State v. Thyfault, 121 N.J. Super. 487, 501 (Cty. Ct. 1972), aff'd 126 N.J. Super. 459 (App. Div. 1974); State v. Sullivan, 24 N.J. 18, 26 (1957). The question which follows is whether the guilty knowledge is inferable from proof that the testimony or representation was factually untrue.
A general statement of the rule applied is that knowledge may be inferred from surrounding circumstances. The State need not produce direct evidence. State v. Haines, 18 N.J. 550, 562 (1955). But in those cases where the proof of objective untruth was held sufficient to prove subjective falsity the nature of the former uniquely lent itself to such a conclusion. As the court observed in La Placa v. United States, 354 F.2d 56, 59 (1 Cir.1965), cert. den. 383 U.S. 927, 86 S.Ct. 932, 15 L.Ed.2d 846 (1966), "in appropriate circumstances belief of falsity may be inferred by proof of the falsity itself." (Emphasis supplied).
In State v. Harris, 132 N.J.L. 54, 59 (Sup. Ct. 1944), aff'd 132 N.J.L. 343 (E. & A. 1945), for example, defendant was convicted of falsely testifying that he had "graduated from the University of Chicago Law School." Rejecting his argument on appeal that the record lacked evidence *402 that he knew his testimony was untrue the court said: "Surely no one better than the defendant knew * * * that he swore falsely." In State v. Haines, supra, defendant's conviction was for falsely swearing before a grand jury that he had not received certain illegal payments from a particular person. There, too, the fact falsely denied and the denial itself were so unequivocal that the impugned testimony necessarily bespoke knowledge of the falsity. The case is similar in State v. Borrell, 18 N.J. 16 (1955), where a police chief was found guilty of falsely denying that he had made an official visit to a certain address.
A leading federal case is United States v. Magin, 280 F.2d 74 (7 Cir.1960), cert. den. 364 U.S. 914, 81 S.Ct. 271, 5 L.Ed.2d 228 (1960), where defendant was convicted of falsely denying certain business relationships under oath. There the court said:
It would indeed strain a juror's credulity to the breaking point to believe that one who had been associated with a relatively small group in a number of unlawful endeavors for a period of five years, did not know those associated with him. [at 78]
On the same reasoning the conviction was affirmed in United States v. Nicoletti, 310 F.2d 359 (7 Cir.1962), cert. den. 372 U.S. 942, 83 S.Ct. 935, 9 L.Ed.2d 968 (1963), where the falsehood found was defendant's sworn testimony that he did not remember being interviewed by F.B.I. agents some time prior to testifying. Obviously, if defendant did "remember" then he must have known he was lying when he swore he did not. See also, United States v. Rivera, 448 F.2d 757 (7th Cir.1971); Commonwealth v. Giles, 350 Mass. 102, 213 N.E.2d 476 (Sup. Jud. Ct. 1966). In these cases the facts falsely sworn to bespoke knowledge. Here we deal not with an unambiguous fact, but with the identity of a person and defendant's actual knowledge thereof. The difference is that there is nothing in the nature of the untruth here to support a belief that defendant must have known it was untrue.
*403 We conclude that under the circumstances of this case Silverman's guilty knowledge was not inferable from the fact that the affidavit was objectively untrue. The evidence is devoid of any implication that Silverman ever knew the decedent prior to the date of the will's execution or that the signature on the will was to his knowledge placed there by one other than DePhillips. Indeed, it is as consistent with the testimony to conclude that Silverman was himself a victim of deception as it is to say that he was a knowing participant in the crimes alleged. That there might have been a financial motive for him to commit this crime does not displace the need for proof. United States v. Spaeth, 152 F. Supp. 216, 221 (N.D. Ohio 1957), aff'd 254 F.2d 924 (6 Cir.1958) cert. den. 358 U.S. 831, 79 S.Ct. 52, 3 L.Ed.2d 69 (1958); 22 C.J.S., Criminal Law, § 31(1).
The State's argument that Silverman should "go forward" with exculpatory evidence disregards the fact that no affirmative proof of his guilt has been shown. We distinguish those cases relied on by the State where evidence of defendant's excepted status from the reach of a criminal statute was held to be matter for defense. State v. Blanca, 100 N.J. Super. 241, 248 (App. Div. 1968); State v. New York Central R.R. Co., 37 N.J. Super. 42, 51 (App. Div. 1955); State v. Rabatin, 25 N.J. Super. 24, 31 (App. Div.), certif. den. 13 N.J. 361 (1953). They apply this proposition only "where the negative of an issue does not permit of direct proof, or where the facts more immediately lay within the knowledge of the defendant". (Emphasis supplied). State v. Rabatin, supra 25 N.J. Super. at 31. While the rule may be sensibly invoked to call upon a defendant in a weapons possession case to show that he held a valid weapons permit, or a railroad company to show that certain noises for which it was responsible were "necessary" in the sense intended by an ordinance proscribing "unnecessary noises," it is entirely inapplicable here where the State has assumed the burden of proving the affirmative fact that Silverman knew the will had not been signed by DePhillips.
*404 Nor will we, as the State argues, reach the result sought by the harsh expedient of imputing guilty knowledge from Boratto to Silverman on the basis of their law partnership. Their professional relationship was presumptively not formed in furtherance of a criminal conspiracy. The intent or knowledge essential to the proof of a criminal act cannot be imputed from one party to another based only on their association as partners in a lawful enterprise. 60 Am. Jur., Partnership § 170.
That the State is presented with a difficult case to prove provides us with no incentive to trifle with fundamental principles of proof. Although expressed in a dissenting opinion, we heed the late Chief Justice's observation that "[t]he badge of criminality should be richly deserved." State v. Sullivan, 24 N.J. 18, 43 (1957) (Weintraub, dissenting), cert. den. 347 U.S. 903, 74 S.Ct. 428, 98 L.Ed. 1063 (1954).
A result other than the one we reach would yield a precedent having the most unreasonable implications, not only to attorneys but to legal secretaries, notaries and many others who regularly accept the responsibility of serving as a subscribing witness. Only the most extraordinary precautions could remove the risk of prosecution for perjury when, years after the event, one swears to the genuineness of a signature written by a party who misrepresented his identity.
Defendants also complain of error in the trial judge's treatment of the "two witness" rule. It is of distant origin, designed to curtail perjury prosecutions based upon "oath against oath," 7 Wigmore, Evidence (3 ed. 1940), § 2040 at 275, and is embedded in our law. State v. Caporale, 16 N.J. 373, 376 (1954); State v. Cattaneo, 123 N.J. Super. 167, 173 (App. Div.), certif. den. 63 N.J. 324 (1973); State v. Bulach, 10 N.J. Super. 107, 110 (App. Div. 1950). Its requirements are met where the State's proofs consist of the testimony of at least two witnesses or the testimony of one witness supported by strong corroborating circumstances to establish the falsity of defendant's testimony. State v. Bulach, supra 10 N.J. Super. at 111. The grievance here voiced is that the *405 opinion testimony of two handwriting experts presented by the State was not sufficient under the rule.
We are satisfied that testimony of two handwriting experts meets the quantitative requirements of the rule under the circumstances of this case. The problem has been elsewhere analyzed and resolved in terms of whether such evidence is characterized as being "direct" or "circumstantial" in nature. People v. Di Giacomo, 193 Cal. App.2d 688, 14 Cal. Rptr. 574 (D. Ct. App. 1961); People v. Follette, 74 Cal. App. 178, 240 P. 502 (D. Ct. App. 1925); People v. Calandrillo, 29 Misc.2d 485, 215 N.Y.S.2d 355 (Cty. Ct. 1961); People v. Wright, 28 Misc.2d 719, 214 N.Y.S.2d 461 (Cty. Ct. 1961). See, generally, Annotation, 88 A.L.R.2d 852 (1963). We reject this approach, however, and rest our judgment on the proposition that regardless of how such evidence is categorized, it accords fully with the protective policy of the rule. This is well explained in United States v. Collins, 272 F.2d 650 (2 Cir.1959), cert. den. 362 U.S. 911, 80 S.Ct. 681, 4 L.Ed.2d 619 (1960), also involving a perjury conviction based on the testimony of two expert witnesses:
Whether the evidence is "direct" in the sense in which the term is usually used should not be the criterion here. The test should be rather whether the evidence is of a quality to assure that a guilty verdict is solidly founded. The purpose of the rule was to prevent ill-founded retaliatory attack by perjury prosecution upon a witness on no more than the contrary oath of another. Weiler v. United States, supra [323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495.] We have here evidence far stronger, more cogent and more convincing than that. If the experts, supported by the exhibits are to be believed, it was an utter impossibility that Collins' testimony before the grand jury was true. The testimony, although in a sense circumstantial, is absolutely inconsistent with Collins' innocence (cf. Allen v. United States, 4 Cir., 194 F. 664, 667, 39 L.R.A., N.S., 385), and is more convincing than would be the recollection of one or two witnesses that he had signed the minutes at a certain date later than the date sworn to by him. The use of such evidence may be considered akin to the use of documents signed by the witness under the rule of United States v. Wood, 14 Pet. 430, 440, 10 L.Ed. 527.

*406 "The question is, when and how the rule is to be applied, that it may not, from a technical interpretation, or positive undeviating adherence to words, exclude all other testimony as strong and conclusive as that which the rule requires." United States v. Wood, supra, 14 Pet. at page 439. [at 662]
We further conclude that the requirements of the rule apply only to the issue of objective untruth and not to defendant's wilfulness in testifying falsely or his guilty knowledge. United States v. Rivera, supra at 758; United States v. Magin, supra at 77-78.
However, we find error in the failure of the trial judge to submit the "two witness" issue to the jury and to explain its function. This was plainly required. Weiler v. United States, 323 U.S. 606, 611, 65 S.Ct. 548, 89 L.Ed. 495 (1945); Spaeth v. United States, 218 F.2d 361, 364 (6 Cir.1965); State v. Lupton, 102 N.J.L. 530, 536 (Sup. Ct. 1926). The error's impact was enlarged by the trial judge's emphasis to the jury that it was not "bound" by the opinions testified to and that it was free to "reject or do anything you want" with them. At no time was the jury cautioned that if they rejected the testimony of either expert there would be no basis for a perjury conviction. In fact, the strict language of the charge left open the possibility of such a conviction even though the jury disbelieved the testimony of both handwriting experts who gave evidence for the State.
Finally, defendants appeal from the trial judge's refusal to grant a new trial upon motion duly made after the return of the verdict. The test applied on such a motion is whether or not, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses there was a miscarriage of justice under the law. Dolson v. Anastasia, 55 N.J. 2, 6-8 (1969); State v. Orecchio, 16 N.J. 125, 129 (1954); R. 2:10-1; R. 4:49-1. The motion should have been granted.
The judgments of conviction on the second and fourth counts of the indictment are reversed and judgments of acquittal *407 entered thereon. The judgments of conviction on the first and third counts are reversed and the matters remanded to the trial court for further proceedings consistent with this opinion.
NOTES
[1] He also admitted on cross-examination that during a family dispute as to where the decedent should be laid to rest he proposed that Boratto forge a writing purporting to express decedent's own preference. This Boratto refused to do.