**Delton LeRoy FITZGERALD, Appellant (Defendant below),**

v.

**The STATE of Wyoming, Appellee (Plaintiff below).**

No. 5058.

Supreme Court of Wyoming.

Aug. 17, 1979.

Jerry A. Yaap, of Bishop, Bishop & Yaap, Casper, for appellant.

John D. Troughton, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., James W. Gusea, Asst. Atty. Gen., and Sandra Dunn, Legal Intern, Cheyenne, for appellee.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

THOMAS, Justice.

Delton LeRoy Fitzgerald, having waived a trial by jury, was convicted, after a trial to the court, of obtaining goods by false pretenses in violation of § 6–38, W.S.1957 (now § 6–3–106, W.S.1977). Fitzgerald seeks reversal of this conviction, and in this appeal he asserts these claims of error:

"1. The trial court erred in failing to declare the value of the property obtained under false pretenses.

"2. The trial court erred in failing to suppress the State's evidence which was obtained by illegal search and seizure, and subsequently used by the police to secure a statement from the appellant.

"A. The trial court erred in failing to suppress the State's evidence consisting of the appellant's bank records obtained by the police on a voluntary basis from the bank without legal process consisting of either a search warrant or subpoena.

"B. The trial court erred in failing to suppress the State's evidence consisting of the defendant's application to the Post Office Department [sic] for a box number in Mills, Wyoming and applications and acceptance for a mail drop in Chicago.

"C. The trial court erred in failing to suppress the statement of appellant given to the police after questioning about the bank records and U.S. postal records seized illegally as evidence.

"3. The State failed to prove the specific intent of the appellant to defraud beyond a reasonable doubt."

Finding no error in any of the matters complained of by Fitzgerald, we shall affirm his conviction.

█ In discussing the facts of this case, we apply the principle that the evidence should be examined in the light most favorable to the State when a question of the sufficiency of the evidence is raised. We accept as true evidence favorable to the State; we disregard evidence favorable to the defendant in conflict with the State's evidence; and we afford to the State's evidence every favorable inference which may reasonably and fairly be drawn from it. *Harvey v. State*, Wyo., 596 P.2d 1386 (1979); *Hovee v. State*, Wyo., 596 P.2d 1127 (1979). Heretofore we have had occasion to apply these concepts only to cases tried before juries. We have no compunction, however, in joining other courts which have applied these concepts in trials to the court. *Sim-*

*mons v. State,* 255 Ark. 82, 498 S.W.2d 870 (1973); *People v. Johnson,* 276 Cal.App.2d 232, 80 Cal.Rptr. 683 (1969). The function of the finder of fact in cases tried to a court is identical to that in cases tried to juries, and the same rules are applicable with respect to the standards and principles applied in appellate review.

In the fall of 1976, Fitzgerald obtained a six-month trial subscription to a magazine called "Money-Making Opportunities." He described it as a magazine consisting of get-rich-quick schemes, ideas and products. He answered several of the advertisements from this magazine, some seven or eight all told. He did follow through with one of them, an advertisement by a firm called Two Brothers, Inc., showing a St. Louis, Missouri address. Two Brothers, Inc., was offering to sell and drop-ship unwoven cotton or rayon towels. One could obtain fifty of their towels for $1.45 plus thirty cents for postage and packing. The price per towel then declined at a gradual rate from $5.00 for 200 towels, or two and one-half cents each, to $164.75 for ten thousand towels which would result in 1.6475 cents per towel. The cost of one hundred dozen towels, which inferentially would have been sold by Two Brothers, Inc., at their price of $17.75 for 1,000 towels, would have been $21.30 or 1.775 cents per towel.

Fitzgerald responded to this advertisement, and he testified that he was sent a letter in reply which had the prices pretty much like those reflected in the advertisement. There was also an explanation of what they referred to as drop-shipping, which was a method pursuant to which Fitzgerald could supply the money for the merchandise ordered together with pretyped or addressed shipping labels, and Two Brothers, Inc., would in turn package, pay the mailing costs and so forth, and ship the product in smaller lots to the persons whose names were on the mailing list.

Fitzgerald followed through with this by running an advertisement in the Casper Shopper on February 23, 1977. This advertisement was taken out in the name of Cannon Bros. Inc., with a Chicago, Illinois address. In his advertisement, Fitzgerald offered the towels at a price of $4.98 per dozen for the first five dozen. This would convert into a price per towel of 41.5 cents. Fitzgerald also had a reducing price scale so that if one ordered as many as one hundred dozen the price was $3.09 per dozen, or 25.75 cents per towel. A comparison of the pricing scales reveals that Fitzgerald's markup was somewhere between 1,450 and 1,660 percent, assuming that he gained no additional markup by ordering towels in large quantities to be sold in smaller lots at a greater price per towel.

In the advertisement by Two Brothers, Inc., the following language appears:

"* * * We SHOULD know Towel values, we've sold more than 80,000,000— that's 80 MILLION—already! We've sold MILLIONS in Sweden, Switzerland, France, Germany, and other companies all over the world! And, in the United States, we sell million after million! Sometimes we ship about a million Towels in a month."

The record is silent as to the veracity of the claims made by Two Brothers, Inc. In his advertisement in the Casper Shopper, Fitzgerald used the following language:

"* * * We should know towel values; we've sold more than 80,000,000—that's 80,000,000—already!!

"We've sold millions in Sweden, Switzerland, France, Germany and other countries all over the world!! And, in the United States, we sell million after million."

It is obvious from the record that Cannon Bros. Inc., had no previous record of such sales.

When the bill for this advertisement became delinquent, the publisher of the Casper Shopper contacted Fitzgerald by telephone. He knew that Fitzgerald had placed the advertisement from an account card which his saleslady had prepared at the time the advertisement was obtained. At that time, Fitzgerald advised him that he was not responsible for the advertising because he had not been paid his commission and he assumed that Cannon Bros. Inc. would pay for the advertisement.

In March of 1977, Fitzgerald opened a checking account at the First National Bank of Casper in the name of Cannon Bros. He identified himself on the signature card as the president under the name of Damon Cannon. The money transactions relating to the sale of towels were handled through his checking account. Fitzgerald admitted advising the saleslady for the Casper Shopper advertising that he was representing Cannon Bros. Fitzgerald testified that Cannon Bros. Inc., is a makeup name of Cannon Towels and Two Brothers, Inc. On cross-examination, in response to a question as to why he chose the Cannon name, he answered:

"Well, that is a well-known name. A person buying a towel, the idea of maybe it is a Cannon towel, they would be more inclined to order them, probably."

Also, in March of 1977, Fitzgerald obtained a mail box for Cannon Bros. Inc., at the Post Office in Mills, Wyoming. At the same time he arranged for a confidential mailing address for Cannon Bros. at the Mail Center of Chicago, 216 Jackson Boulevard, Chicago, Illinois 60606. This was the address used in the advertisement in the Casper Shopper. Mail sent to that address would be forwarded to the Mills address, but subject to the payment of new postage for which the Mail Center of Chicago required an advance deposit.

In March of 1977, Delores Cashel responded to the advertisement in the Casper Shopper. She submitted an order for 85 dozen towels at $3.09 per dozen for a total of $262.65, together with postage in the amount of $25.50. She enclosed an Omaha National Bank Draft No. 18199 for the amount of $288.15. Mrs. Cashel worked at the First National Bank of Casper, and when the towels were not received, she checked the draft in the bank records and found that it had been paid. She also discovered that it had been deposited in the First National Bank, endorsed by Cannon Bros. In addition she found a deposit slip for that firm in the amount of $288.15, and she further discovered that that amount had been drawn out of the account on checks payable to Del Fitzgerald but which were signed by Damon Cannon.

She then attempted to contact Mr. Fitzgerald, and about an hour and half later she received a return call at the bank from him. She complained to him about the failure to receive the towels and told him that she had written asking about her order. She testified Fitzgerald said he had placed the advertisement for the company, but he had nothing more to do with it after placing the advertisement, and he did not know what happened. She asked him who Damon Cannon was, and he told her he was a representative of the company. She then asked him how she could contact Damon Cannon, and Fitzgerald told her that she could not contact him.

Upon investigation by the police department of the City of Casper, the bank records of the First National Bank relating to Cannon Bros. were voluntarily made available by the bank to the investigating police officers. After a motion on the part of Fitzgerald to suppress these records, they were admitted into evidence at his trial. Similarly, authorities of the United States Postal Service made available to the Casper police officers the Postal Service records relating to the mail drop in Chicago. Again, after a motion to suppress, these records were admitted into evidence over Fitzgerald's objection. The record is clear that Fitzgerald did not give his consent in either instance to the records being made available. After obtaining these records, the police officers interviewed Fitzgerald, and he made a written statement. At that time, he advised the police officers that in January of 1977 he had answered an advertisement to represent Cannon Bros. Inc. in the sale of towels. He described an arrangement pursuant to which they agreed to pay for the advertising and he then contacted the Casper Shopper and together with the saleswoman made up the advertisement. He then advised that he began receiving complaints about the last week of May from people who were not getting their orders, but he was not concerned about the complaints at that time. He ad-

mitted setting up the mailing address at Chicago, and stated that about the last of May he started receiving commission checks from Cannon Bros. Inc. He said he received three or four checks for a total of about $700.

He stated he realized in the latter part of June 1977 that he was part of a fraud of some kind, but that he did nothing to help correct the fraud. He stated that he did write a letter to Cannon Bros. Inc. about the fact he had received complaints about orders not being received. He stated the letter was returned to him with a stamp across the envelope that no such party was at that address. He stated that he knew there was a checking account at the First National Bank for Cannon Bros. Inc. but he had nothing to do with this account. Again, following an unsuccessful motion to suppress the statement and over Fitzgerald's objection, his statement was admitted into evidence at the trial.

Fitzgerald waived his right to be tried by a jury, and after the trial to the court he was found guilty. The court at that time stated that there did not seem to be much difference between the State and Fitzgerald as to the facts with the exception of Fitzgerald's subjective state of mind. The court made the following comment in connection with its finding of guilty:

"In this somewhat odd sense, I am not convinced beyond reasonable doubt that Mr. Fitzgerald, you intended to take the entire amount here received and keep it entirely to yourself; I am not convinced beyond reasonable doubt that you did not mean to obtain some delivery of some goods. I am convinced, however, that you did, and you did at the time of the inception of the scheme as had been said by [counsel], rather his terminology, in general expressing of the law here, convinced that you did obtain something by a false pretense and knowingly and designedly, by all of the circumstances, but in particular in the employment of various names, it seems to me you must have been designed to mislead and to state something that was not true. The re-

peated use of a very well known name, and probably subject to a federal patent or copy right protection, very well known in the business; you apparently used that and apparently intended people to believe that you were selling Cannon towels."

The court then sentenced Fitzgerald to the Wyoming State Penitentiary for not less than one and not more than one and one-half years; fined him $1,000; and ordered that he make restitution of the amount obtained from those who had attempted to order towels.

Turning to Fitzgerald's claim of error because of the failure to declare the value of the property obtained, Fitzgerald points us to § 7–11–502, W.S.1977, which was § 7–267, W.S.1957, providing that:

"When the indictment charges an offense against the property of another by larceny, embezzlement or obtaining under false pretenses, the jury, on conviction, shall ascertain and declare in their verdict the value of the property stolen, embezzled or falsely obtained."

There is no question that in several instances involving trials to juries this court has held it to be reversible error for the jury to fail to make such a finding. *State v. Chambers*, 70 Wyo. 283, 249 P.2d 158 (1952); *Merrill v. State*, 22 Wyo. 186, 136 P. 795 (1913); *Thomson v. State*, 21 Wyo. 196, 130 P. 850 (1913). Fitzgerald urges the application of the same rule in a trial to the court.

We conclude that the statute on its face is applicable only to trials to the jury. The requirement is present to assure that the jury in fact considers all elements of the crime, and particularly where value may increase the severity of the sentence the jury is asked to specifically consider the element of value in this way. In this case, the property obtained was in the form of a cashier's check, and value was not in dispute at the trial. On its face it was over the one-hundred-dollar amount required to make the offense a felony. In addition, it is clear that the trial court specifically considered that element of the offense. In reporting his finding of guilty, the trial court stated:

"I come to the conclusion that there was an obtaining of a thing of value, and over that statutory minimum limit, by false pretenses, which was knowing and designed."

We find no error here in the failure of the trial court to specifically find the value of the property taken.

■ With respect to the points of error arising out of the obtaining of the bank records and the United States Postal Service records without legal process, we note the holding of the Supreme Court of the United States in *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), to the effect that a person has no reasonable expectation of privacy with respect to bank records. The Court held that such checks, financial statements, and deposit slips contained information voluntarily given to the bank, and that they were records of the bank with respect to which the customer could assert neither ownership nor possession because the bank also is a party to transactions involving such accounts. The Court held that there could be no legitimate expectation of privacy with respect to such accounts. In *United States v. Poole*, 557 F.2d 531 (5th Cir. 1977), the Court of Appeals adopted the *Miller* decision, and stated that it made no difference whether any process was obtained for the purpose of obtaining the records. The permission of the bank to search for the records was deemed to be adequate for the officers to obtain them. We adopt this rule and in so doing reject the contrary rule espoused by the California court in *Burrows v. Superior Court of San Bernardino County*, 13 Cal.3d 238, 118 Cal.Rptr. 166, 529 P.2d 590 (1975).

■ We then are satisfied that the same rule appropriately is to be applied with respect to the records of the United States Postal Service. The Postal Service was a party to the transactions reflected by these records, and there could be no reasonable expectation of privacy by Fitzgerald with respect to them. This is particularly true in light of the regulations relating to the disclosure of names and addresses of customers which have been adopted by the United States Postal Service. 39 C.F.R. § 265.6 (1978), states, among other things:

"(4) The business name and address of the holder of a post office box being used for the purpose of doing or soliciting business with the public, and any person applying for a box in behalf of a holder, will be furnished to any person without charge. The postmaster may furnish this information when he is satisfied from the entries appearing on Form 1093, Application for Post Office Box, or from evidence furnished by the requestor, such as an advertising circular, that a box is being used for such a business purpose.
\* \* \* \*"

Again the fact that they were voluntarily made available by the Postal Service to officers of the Casper Police Department is not material because there was no unlawful seizure of such records.

Holding as we have that the bank records and the United States Postal Service records properly were received in evidence, there was no error in the admission into evidence of Fitzgerald's written statement to the police officers. His claim with respect to the statement is that it was obtained by using the unlawfully obtained records, and, therefore, was the fruit of the poisonous tree. Since we hold that the tree in fact was not poisoned, then its fruit, whatever that may have been, was available to the prosecuting authorities in connection with the trial of Fitzgerald.

■ Fitzgerald's final claim is that the evidence of record is insufficient to establish the element of fraudulent intent. There is no question that the intent to defraud is an essential element of the crime of obtaining property by false pretenses. *Driver v. State*, Wyo., 589 P.2d 391 (1979). This element may be inferred from the conduct of the defendant and from circumstantial evidence. *Hovee v. State*, supra; *Beane v. State*, Wyo., 596 P.2d 325 (1979). The evidence favorable to the State has been recited in some detail. Fitzgerald made false representations with respect to the identity of the seller, and prior sales volume. The finder of fact might even

infer that the representation of value in Fitzgearald's sales price was false. Despite the fact that Fitzgerald did in fact send a check drawn on the Cannon Bros. account customer who had submitted the cashier's check for $288.15, the trial court correctly ruled that the finding of fraudulent intent was not premised upon an intent not to deliver some merchandise. Instead, it was premised upon the false pretenses found in the Casper Shopper advertisement. A deliberate suggestion of a nationally recognized manufacturer was encompassed in the business name chosen by Fitzgerald and incorporated in the advertisement. When these misrepresentations and the obtaining of the property are examined in connection with the other conduct of Fitzgerald in assuming a false identity for the purpose of writing checks on the Cannon Bros. account to himself; in disclaiming knowledge as to Cannon Bros. Inc., although he had set up that business entity; and in the misleading of the police officers through his statement while at the same time conceding that he was aware of fraud, we are satisfied that there is sufficient evidence which would permit the finder of fact to infer the requisite fraudulent intent in this case. It is properly the role of the fact finder to draw inferences from circumstantial evidence, and if those inferences are justifiable, as these are, the appellate court does not substitute its own inferences for those of the trial court. *Russell v. State*, Wyo., 583 P.2d 690 (1978); *United States v. Spoonhunter*, 476 F.2d 1050 (10th Cir. 1973); *State v. Bloom*, 90 N.M. 192, 561 P.2d 465 (1977); *Hall v. State*, Okl.Cr., 559 P.2d 856 (1977).

The judgment of conviction in this case is affirmed.

ROSE, Justice, dissenting, with whom McCLINTOCK, Justice, joins.

I would have reversed because the proofs of the necessary mental elements and the complaining witness' reliance were made with respect to different misrepresentations.

In this case, the State has proved no misrepresentation which resulted in whole or in part in the complaining witness' decision to part with her money and which was made with defendant's knowledge of its falsity.

The elements of the crime of obtaining property by false pretenses, recently enunciated by this court in *Driver v. State*, Wyo., 589 P.2d 391, 393, are: "(1) the pretenses; (2) their falsity; (3) the fact of obtaining the property by reason of the pretenses; (4) the knowledge on the part of the accused of their falsity; and (5) the intent to defraud."

*The Intent Issues*

I have no problem with the conclusion that the specific-intent requirements of the crime of false pretenses were met with respect to at least some of the false representations. Even if Fitzgerald did pay to have the towels shipped to the complaining witness, it is clear by his own testimony that he chose the name "Cannon Brothers" in the hopes of inducing readers of the advertisement to believe that they were getting "Cannon" towels. As was said by the Nevada Supreme Court earlier this year:

"... '[F]alse pretense' is a 'representation of some fact or circumstance which is not true and is calculated to mislead ... [and] may consist of any act, word, symbol or token calculated and intended to deceive. *It may be made either expressly, or by implication.* ... .' " *Buckner v. State*, Nev., 590 P.2d 628, 630 (1979), citing *Bright v. Sheriff*, 90 Nev. 168, 170, 521 P.2d 371, 373 (1974). [Emphasis supplied]

It was not true that Cannon Brothers sold the towels. The misrepresentation was designed to mislead. Accordingly, the two "intent elements" of the Wyoming crime of obtaining property by false pretenses were met with respect to certain false pretenses: (1) the knowledge on the part of the accused of their falsity; and (2) the intent to defraud. *Driver v. State*, supra.

*Reliance on the False Representations*

The complaining witness limited her testimony to the following: (1) She sent a

bank draft to Cannon Brothers along with an order for towels; (2) she got nothing in return; (3) she tracked down Fitzgerald and demanded satisfaction; (4) Fitzgerald denied responsibility; and (5) she went to the police.

The law is clear that the above testimony is sufficient to allow the inference that the complaining witness parted with her money in reliance upon the representation *that she would receive the towels.* *Hymes v. United States,* D.C.App., 260 A.2d 679 (1970); *State of New Jersey v. Allen,* 53 N.J. 250, 250 A.2d 12 (1969); *State v. Crow,* Mo., 487 S.W.2d 461 (1972); and *Davidson v. Commonwealth,* Ky.Ct.App., 436 S.W.2d 495 (1969).

The representation that she would get the towels turned out to be false. However, the judge found that there was at least reasonable doubt as to whether Fitzgerald knew that representation to be false or intended—at the time of obtaining the money—to defraud the complaining witness by not giving her the towels.

Because of my ultimate resolution of this case, I need not consider whether a false representation as to future conduct is a sufficient false representation to justify conviction for the crime of obtaining property by false pretenses. This question was reserved in *Driver v. State,* supra, 589 P.2d at 394.

In this record, there is not one iota of evidence in support of the State's case (or in the rebuttal of the defense) indicating that the complaining witness relied on any other false representation made by Fitzgerald. Whether or not the complaining witness thought she was ordering Cannon towels is not known. Whether or not the complaining witness was induced to mail in her money by Fitzgerald's claim (in the advertisement) that he had sold millions of towels is not known. Whether or not the non-existent Chicago address used by Fitzgerald induced the complaining witness to part with her money is not known.

There is, therefore, insufficient evidence that Fitzgerald obtained money because someone relied on a false representation made by him and known by him to be false. Were it established that the complaining witness had sent Fitzgerald money upon the *representations* that she would get towels *and that the towels would be Cannon towels,* Fitzgerald's good faith as to one of the two representations would not establish his innocence. *Driver,* supra. But, by the same logic and authority, the State had the burden of proving that the money was obtained, at least in part, because of reliance on a false representation made with knowledge of its falsity and with intent to defraud.

Additional authority for this obvious point is found at page 660 of LaFave and Scott, Criminal Law (1972), which contains citations to cases. More recent cases on this point are: *State v. Boratto,* 154 N.J.Super. 386, 381 A.2d 794 (1977), cert. granted by New Jersey Supreme Court, 77 N.J. 475, 391 A.2d 490 (1978); *Kinder v. State,* Tex. Crim.App., 477 S.W.2d 584, 586 (1971), reh. den.; and *People v. Ferrell,* Colo., 591 P.2d 1038, 1039 (1979).

### The Rationale for Affirmance

The logic of the trial judge and the majority disturbs me. In pronouncing Fitzgerald guilty, the trial judge said:

"I come to the conclusion that there was an obtaining of a thing of value . . . by false pretenses, which was knowing and designed. In this somewhat odd sense, I am not convinced beyond reasonable doubt that Mr. Fitzgerald, you intended to take the entire amount here received and keep it entirely to yourself; I am not convinced beyond reasonable doubt that you did not mean to obtain some delivery of some goods. I am convinced, however, that . . . at the time of the inception of the scheme . . . you . . . designed to mislead and to state something that was not true. . .

"This . . . seems to me to constitute what is required here by law, even if you meant to obtain some delivery. . . ."

For purposes of trying to understand the majority and the trial judge, I will assume, arguendo that somehow the intent to defraud permeated every misrepresentation made by the defendant. Still, the trial judge expressly found that the representation that the victim would get her towels was not proven to have been made with knowledge by the accused of its falsity.

It appears to me that the majority is adopting by implication one of two mistakes: Either (1) an express exculpatory finding, supra, can be negated by inferences, or (2) the crime of obtaining property by false pretenses has been committed where the complaining witness parts with property in reliance upon a misrepresentation made *without* knowledge by the accused of its falsity so long as the accused made *other* misrepresentations with intent to defraud, even if these *other* misrepresentations *were not relied on* by the complaining witness in parting with her property.

It may well be that we could, in logic and law, affirm this conviction had the prosecutor asked the complaining witness only one more question which would have established her reliance on a misrepresentation which satisfied both intent elements of the crime. But we may not, in my judgment, supply missing elements of a crime by speculation. *Moore v. United States*, 429 U.S. 20, 22, 97 S.Ct. 29, 30, 50 L.Ed.2d 25 (1976). To infer such reliance from this record is to engage in mere speculation.

I would have reversed.